May it please the Court, Leonard Simon for the Policemen's Annuity and Benefit Fund of Chicago. I'd like to reserve three minutes of my time for rebuttal. In this case, a jury found loss causation on a complex record involving partial disclosures, multiple partial disclosures. They heard two qualified experts, qualified under Daubert, argue about what the facts meant, what the disclosures meant, what the research reports meant. They were properly instructed. They were given a special verdict form. They returned a verdict for the plaintiffs. Before they returned a verdict for the plaintiffs, the trial judge said, in denying a Rule 50A motion, that if the plaintiffs could show that the UBS research reports, sometimes referred to as the Flynn research reports. I'm sorry we confused you, but Ms. Flynn wrote the report for UBS. The judge said if the UBS research reports connected the dots, quote, unquote, because the corrective information had dribbled in, quote, unquote, the plaintiffs could win. Therefore, the case belonged with the jury. When the jury returned a verdict for the plaintiffs on the Rule 50B motion, the judge, only a couple of months later, granted the Rule 50B, of course, which is why we're here on our appeal, but more important, he said a case in which a second disclosure could connect the dots would be a rare one for which he does not cite precedent, and I believe, Your Honor, he's disputing the Gilead holding of this court. More important, he says, the evidence presented in the trial undermined plaintiffs' theory of loss causation, undermined their ability to prove the dribbling in, I suppose, or the connecting of the dots. Now, Your Honor, can you just tell us, I mean, because this is the nub of the case, can you just tell us what happened between the denial of the 50A and the granting of the 50B? What was the new evidence that came in? The defendants put on their case, Your Honor, I'd have to speculate as to which evidence turned. Well, let me say, I don't have to speculate. Well, he did write an opinion, so you don't have to speculate. He did write an opinion, and he identified the testimony of Ms. Thompson, who testified there was no turnover. But with due respect to the trial judge, and I clerk for a trial judge, I have great respect for trial judges, I think if the court looks at that. I'm glad to hear that. If the court looks at what he said, when he says he credited the testimony of Thompson, and you've read our discussion of Reeves about that, we say he can't credit it, they say it doesn't matter, and Your Honors can resolve that. We can talk about that if you like. I don't think it's the first issue. But I think the first issue is what really turned him. And I think what really turned him is that between the denial of the 50A and the grant of the 50B, he heard the defendant's expert, Professor Lean, who testified at length, on direct, and on cross, with charts and graphs and statistical significance, and said, this doesn't work. They haven't proven loss causation. And he heard Mr. Smith, my adversary, make a closing argument in which he very articulately and effectively argued that loss causation had not been proven. Loss causation was a big, big issue in this case. We litigated fraud. We litigated scientific materiality, all that. Loss causation was big from the beginning to the end. And I think, again, with due respect to the trial judge, what he's saying when he says the evidence undermined the plaintiff's case is that he was convinced by Dr. Lean that his take on the evidence was better than Dr. Feinstein's take on the evidence, which is a violation of Reeves against Sanderson. Under Rule 50B, of course, the jury is not required to accept the testimony of an expert witness, not required to accept the testimony of any witness presented by the defense. Maybe a disinterested witness's testimony is uncontradicted. That's what Reeves said. But an expert witness is not disinterested, and he was surely not uncontradicted. So we have a line of cases in this court. But I won't waste your time giving you citations to cases that say a battle of the experts, both qualified, butting heads on the issue which the case turns on, is not ordinarily a case in which one grants a 50B. One might grant a 50A, having heard the plaintiff's expert say he didn't hit the ball. He didn't hit the ball far enough. He didn't deliver the goods. This evidence from this expert plus the evidence from the plaintiffs by way of precipient witnesses and exhibits doesn't get you there. But that's not what he said. At the end of the evidence, he said, if the plaintiffs show that UBS connected the dots, the plaintiffs win. In a sense, it doesn't really matter what he said. We could certainly affirm if he should have granted the 50A. If he had granted the 50A. No, if he should have granted the 50A. If he should have granted the 50A, the Court should affirm. That's correct. So we can affirm. I'm not. Well, it's sort of interesting to know what was going on. Was it Judge Anderson, right? Pardon me? Who was it, Judge Anderson? Judge Teelborg. Oh, Judge Teelborg. I'm sorry. I got my cases confused. Judge Kuczynski, I would not suggest that he's stuck with what he said on 50A. I was actually suggesting something slightly. Judge Anderson's charges in the next case. Sorry. You know, sometimes what happens is a judge may be inclined to grant the 50A, but thinks, no, better let the jury handle it. Maybe they'll come out the same way, and I won't have to do it. And he may not say that, but if he should have granted it at that stage, that would be a sufficient basis for us to affirm. So I don't think we can limit ourselves to looking to what happens in the defense case. We have to look at the entire factor to see whether or not his ruling can be sustained on that basis. I agree completely, Chief Judge Kuczynski. But what I would say is what he said on 50A about connecting the dots is entirely consistent with Gilead. It's consistent with America West. It's consistent with controlled data in the Eighth Circuit. It's consistent with Motorola from the District of Illinois. All those cases hold that when you have two disclosures or three disclosures, you have partial disclosures. We don't have a mea culpa here. We don't have the stock falling off the table when the company says we made a mistake. The company never says anything. The company says nothing. We have disclosures in newspapers followed by disclosures. You had newspaper reports that started off a downward trend, right? Correct. And so the big drop happened right after the UBS report came out. Correct. And was it because of the UBS report or was it because the data had been sitting there percolating? I mean, you know, that's why we have juries, I suppose. I think that's the key question. But what I would say is that when the Arizona Republic article came out on September 14th, first media story with something about the DOE report, its bottom line conclusion, it said some bad things for Apollo. Then it said some good things for Apollo. Quoted Apollo executives saying everything's okay, the government's wrong, they would never have settled with such a small fine if this was a serious case. Their bottom line is, and let me quote it to get it exactly right, almost at the end of the article, this is ER 580, quote, company executives and Wall Street analysts, I hope you heard the emphasis in my tone, and Wall Street analysts hailed last week's settlement as removing a cloud hanging over Apollo. And UBS had issued a report during this time frame also in which they said everything was okay. But a week later, the UBS analyst, Ms. Flynn, who's an education specialist, writes a new report. Why do you write a second report? Not to repeat yourself. She wrote it because she had read the report and she reaches an entirely different conclusion. The clouds that we're lifting are back and they're storm clouds. When you say read the report, she read the original DOE report? Correct. The one that was never publicly released by the company? Correct. Has that report ever been publicly released? Well, it's available under the FOIA. So many people got it after the Arizona Republic got it. But it's pulling teeth to get it. I'm not sure. I don't think it's sitting in some public reference room in Washington, D.C. where you could walk in and get it. I'm not positive these folks are right. But it's now known what it says. Right. It was never released at the time by the government. It was never released at the time by the company. The Arizona Republic got it. And at the time of the second Flynn report where she downgrades the stock, was it publicly known? I think the answer is no, but I want to make sure I understand what's going on correctly. Who knew about what was in that report at that time? Was the general public aware of that report in the sense of having been able to read that report? No. They were able to read the Arizona Republic article, which contained very small excerpts of the 35 pages. So at the time we get the second Flynn report, the downgrading Flynn report, the public is dependent upon others to interpret the report and its meaning. That's precisely correct, Judge Fletcher. And interpret, you know, interpret is a word that is used in some of the cases. Explain is a word that is used in some of the cases. And she explains several things. Your time is going to run, so I want to make sure I get to my question. Assuming that we agree with you that the jury as instructed resolved questions of fact within its purview, the next question is going to be, well, the jury instructions were wrong. And, of course, that's argued. So could you tell me why the jury instructions are right, as I expect you will think they are? Well, the jury instructions are pretty much model Ninth Circuit jury instructions put together by the judge in a fashion in which I don't think any of the individual jury instructions are debated by my worthy adversaries. They say that they were the objected to a trial. Oh, there were. Yes, there were. There were longer, more complex, and with respect, more defense-oriented jury instructions offered on every point by the defendants. Well, my question is a little bit different from that. I mean, it's very common for there to be competing jury instructions. Once the judge settles on the instruction, was there an objection? I'm not positive. I'm sure my attorney will have the answer. I guess I'll find out. I believe so, but I don't want to concede a point. Well, has the defense raised the jury instruction on corrective disclosure as an issue in this appeal? No, that was their instruction. The issue, the principal jury instruction they raised on appeal is that the jury instruction on causation and the jury instruction on damage are or the jury instruction on damages, which is S.E.R. 121, is misleading because it first says you could only award the plaintiff his economic loss sustained by the fraud, or economic loss, and then it says only the loss sustained by the fraud. They're in consecutive sentences, and their position appears to be that the jury instruction was confusing because the jury wouldn't understand the third sentence having just read the second sentence. And Judge Teelborg saw this. Now we're on an abuse of discretion standard, of course. On their, I guess I don't call it cross appeal, but on the new trial motion, it's an abuse of discretion standard. And if you notice what Judge Teelborg said, again, I hate to play mind reader to a district judge, but he said something very interesting. When they moved for a new trial, he said, and we quoted it in the brief, I won't bother to quote it in hyperbole, no, if the Ninth Circuit thinks I'm wrong on loss causation, I think everyone got a fair trial and justice was done. He did look at the jury instructions, again, post-trial, at a time when he granted a 50B. So he was being as careful as he could be, and he didn't find a problem with the jury instructions. He didn't find a problem with the exclusion of the evidence. And I think they're kind of routine. It's a 403 exclusion of evidence. It's not a big deal. The jury instructions, as I said, they're out of Dow. They're out of model jury instructions. They're right out of Ninth Circuit cases. It's not a question of an erroneous instruction. It's a question of a misleading instruction, is the assertion, because of the way they're put together. And, of course, that argument could be made in every case, and I think the trial judge did what he could do. But there's no appellate issue as to the instruction on the disclosure itself. The need for a corrective disclosure? The instruction that lays out what a corrective disclosure is and what the jury must find is not being contested in this Court. I don't believe so. And, again, I'll stand corrected. Well, I can just tell you I haven't seen it in the briefs. Again, going back to Judge Fletcher's point, they offered a longer, more complex instruction on corrective disclosure. They got a lot of what they asked for. They may have objected at the time. I don't see it in the briefs at this level. But I think I'd better reserve the rest of my time for rebuttal. Okay. We'll hear from the opposing counsel. Good morning, and may it please the Court. My name is Douglas Cox, and I represent the defendants who are appellees here today. Picking up on your question, Judge Gellman, we do embrace the instruction about corrective disclosure, and I think it solves a lot of the questions the panel was asking. When you look at that instruction, which you can find at the supplemental excerpts of Record 118, the judge does two things on this issue. First, he says to the jury that a disclosure that reveals the fraud to the market is a corrective disclosure. He then goes on to say that the alleged misrepresentations here could have injured the plaintiff only if, only if you determine that the analyst reports by Kelly Flynn were corrective disclosures. That is, that Flynn revealed the fraud to the market. Nobody challenges that here today. It's unchallenged. The district court did his job under Rule 50. He looked at the evidence in the record, and Chief Judge Kaczynski, when you talk about looking at the entire record, that is correct. But here, of course, that instruction narrows it. It narrows the inquiry to what's in the Flynn reports and what was already disclosed to the market. Now, when you look at what... Well, that's not exactly narrow, is it? Well, actually, it is, Your Honor. It is a relatively few documents compared to the entire jury record. You do have a large number of newspaper articles. It's not just the Arizona Papers, the Dallas Morning News, the Wall Street Journal. It's undisputed that Apollo was followed by 15 to 20 individual analysts, 400 institutional investors with their own analysts in an efficient market. But in terms of... Did you say in an efficient market? Yes, Your Honor. Is that proven, that the market is efficient? Are you asking us to assume that the market is efficient? Your Honor, I think both sides stipulated before the case went in that it's an efficient market. And are you asking us to assume that all those other analysts are appropriately describing it? I mean, I'm not quite understanding what you mean when you say in an efficient market. Well, Your Honor, as I say, both sides agree it was an efficient market. The jury instructions said in an efficient market, new information is assimilated into the market rapidly. There is kind of another issue about how rapidly. But that's where the parties are. But, Chief Judge Kaczynski, when you look at what's in the Flynn reports and you can go back and compare it to these things I mentioned, it's a relatively small number of documents. And, again, when you look at what the district judge did in his opinion, he doesn't challenge Gilead. He embraces a connect-the-dots theory. He gives the plaintiff the benefit of that looser standard. We argued to him, as we argue to you, that the correct legal standard is when you're talking about a corrective disclosure that must reveal the fraud, that there must be new fraud-revealing information. And there are a number of cases throughout the country that say that. But even if you say, as the district judge said, okay, maybe an analyst can reveal fraud. Maybe. Rare case, but maybe. And he gave him the benefit of that. He looked at it through their eyes. He said, what do you, the plaintiff, say is in the Flynn report? Okay. You say it's these three things. I'm now going to look at what's in the record. And he was very clear and very strong. He says, for example, that one of their arguments is demonstrably false. He says another one of their arguments is not. Okay. Let's take that. Which one was that? He says that their argument that Ms. Flynn was the first to disclose certain regulatory issues involving Apollo. But she was the first to actually bring it down to Apollo as opposed to the sector itself. No, Your Honor. With respect, that's not right. If, for example, you look at the Wall Street Journal article, which came out on September 15th, almost a week before Ms. Flynn, the headline of it is Apollo's in trouble. It's going to bring down their stock. They've got enormous problems with their business model. Why do they have problems with their business model? They've had a very aggressive growth. They've gotten this growth. It's key to their business model because they get this money from the Department of Education. The Department's mad at them. They're going to have to change their practices. That will bring it down to stock. Sorry to interrupt you. Can you point me in the record? I would like to reread that Wall Street Journal article. Yes, Your Honor. You can find that in excerpts of Record 671. Would you like to do that now? Well, keep talking. I'll just look at it. Okay. 671. That wasn't the article that the district judge actually hung his hat on. He hung his hat on the Tribune article, right? Well, Your Honor, in his opinion, he does cite the Tribune article, which is also in the excerpts of Record 598. Which is basically a repeat of the Arizona Republic article. It does build on some of the earlier articles, as they all do. They do have analysis in them. They do quote at length sort of the greatest hits out of the Department of Education's report. So I think, Your Honors, that it's clear that the district judge was convinced, when he looked at the record, that there was nothing fraud-revealing in the Flynn reports, whether looked at in terms of bringing out a new fact or whether looked at as bringing a fraud-revealing analysis. But one of the other things that he discussed in his opinion was the decline or the ‑‑ I'm sorry, the increase in the turnover for the recruiters. And what did he base that on? He said that that's not true. Yes, Your Honor. What did he base that on? He based it on the testimony of one of the defense witnesses, Ms. Thompson. Ms. Thompson. Okay. So wasn't the jury entitled to disbelieve Ms. Thompson? Well, Your Honor, they may be entitled to disbelieve Ms. Thompson, but if I can make several points about that. My first point would be he says Ms. Thompson's testimony is uncontradicted. Secondly, even if we discount her testimony because it's allegedly interested, as my colleague suggests, it remains the case that then there is no evidence about that in the record. And because they have to prove ‑‑ Except the Flynn report. But the Flynn report doesn't tie anything about turnover to the Department of Education report. It asserts it in a bullet point in a different part of her report. So there's an absence of proof on this point. And that absence of proof means they haven't proved that Flynn is correct. We know from other evidence in the record after September 21st that she's not correct. We also know that other analysts had flagged this very point. Jeffries had flagged it earlier that maybe there's going to be a decline in productivity with the recruiters. We're not interested in turnover just for turnover's sake. We're interested in is turnover going to affect the financial success of Apollo. Other analysts had already flagged that. The whole point was that DOE ‑‑ I'm sorry. Go ahead. I defer to my friend on the right here. But DOE basically said these people cannot be paid by commission. These people depended on being paid by commission. Most of the recruiters, and I'm using the word recruiters. I think there's another term used in the record. But most of them were students who went out and got other students for the University of Phoenix. And they were now being discouraged because of the DOE report and the DOE findings that they were being paid in properly. And what Flynn said is this is going to have a huge effect on Apollo's growth and performance. Isn't that new? I mean, that's the first time that that's ever been put out into the public. With respect, Your Honor, no. It is neither new nor fraud revealing. On the new point, again, as I said a moment ago, the significance of if there is turnover among the recruiters is not because we're concerned about these people changing jobs. It's its impact on Apollo's productivity and, therefore, its stock price. And when you look at the Jeffries report on September 8th, again, this is now almost two weeks before Ms. Flynn. You can find this at excerpts of record 636. Jeffries says, quote, there have been questions relating to recruiter productivity based on a change in recruiter compensation plans. Management has stated it's pleased with productivity. I'm going to jump some words. More time may be needed to truly see if the new comp plan will negatively or positively impact recruiter productivity. So the issue's already been flagged. And, Your Honor, I also submit this. So what does he talk about turnover? By the way, do you think counsel could have shrunk his hands even more to make them less readable? I don't know why we get tons and tons of these things with exhibits that are hardly capable of the human eye to read. I agree they are difficult to read, Your Honor. I'm wearing my magnifiers, and I'm able to read the first sentence of the Jeffries report upon which you rely. That first sentence says we reiterate our hold reading and expect that the stock will trade higher on resolution to two outstanding issues of the DOE and the Office of Inspector General. That doesn't sound to me like that's very negative. But, Your Honor, the question's not negative or positive. It's new fraud review. And, Your Honor, we don't deny that there's something new in Ms. Flynn's report. That's the downgrade. New information can move stocks. It just doesn't mean... I thought the turnover was new as well. Your Honor, that's the issue we've been talking about. And, as I say, we think that regardless of what you do with Ms. Thompson's testimony, that it remains the case that they haven't proven that what Flynn said on that point was true. And, therefore, it's not part of the truth getting into the market. Secondly, she doesn't link it either to fraud or... Well, Your Honor, because when the district judge before... Because 50B exists as a mechanism to give district judges the obligation to see if there's substantial evidence to support the case. And we have this unchallenged instruction about what is a corrective disclosure and which is tied only to the Flynn reports. And, as I said, the district judge took plaintiff's view of the law that you could have connected dots, be fraud-revealing. And he went through and said there's no substantial evidence. There's no evidence. In fact, he concludes that the evidence undercuts their case in so many words. So I think, Your Honor, that he did his job under Rule 50. It's a very clear... I'm sorry. I've been listening to you, and I'm still not finding the answer to the question I thought I'd ask. And that is the question about turnover. Your one answer to that question was it's not true. And that's why we went off on this tangent about whether it's true or not. But we don't decide whether things are true or not. We decide whether or not there's evidence. So the fact that you think they're true or you think they're not true or they may be true in some sense is just entirely irrelevant. There's no jury here for you to argue. What I was asking you is about evidence. And let me ask you just one more time. And just listen carefully and see if you can give me a straight answer in plain English. The Flynn report talks, as best I can tell, and this is a big record, and I may be wrong about this, and you can correct me if I'm wrong. But as best I can tell, this is the first time there is a public disclosure about the high turnover and its effect on the profitability of the company. Now, you tell me where that is wrong, where there has been prior disclosure of high turnover. Nothing else, just that. Your Honor, if you look at the Jeffries report. Okay. I've got it in front of me, and I don't have those magnifying glasses. But if you tell me where to look, I will strain my tired eyes and try to find it. Yes, Your Honor. If you look. Is it on page 635 or page 636? 636, Your Honor. Okay. And it's the last bullet point. I see the last bullet point. Which part of the last bullet point? I'm going to have to take off my own glasses, Your Honor. It says there there have been questions relating to recruiter productivity. And as I said, that's the turnover issue. No, it's not the turnover issue. Productivity and turnover are different concepts. Turnover means people come and people go. Turnover means that you've got an unstable workforce. It means that people who have experience in producing profits are now leaving and going somewhere else. That's what turnover says to me. Productivity means they are now being lazy and somehow not. Why are they the same? Your Honor, I think because both of them are going to, whether or not, Apollo with this compensation plan. Okay, I'm sorry. I asked the wrong question. Let's assume they are different. And you can persuade me they are not. Where is the turnover discussed in the Jeffries report? In those terms, Your Honor, it is not discussed. Well, those are the terms in which I asked the question. So why isn't your answer no? As I said, Your Honor, in those terms it's not discussed. But I submit that the significance of turnover is not simply that people are changing jobs. It's the impact on the company. But why is that what we have jurists to decide? I don't know whether it is or not. I haven't listened to the whole evidence at trial. And why can't the jury take a look at it and say, look, the fact that for the first time it's disclosed that people are, they are key people, the people who are responsible for this phenomenal growth are leaving, it's sort of like rats leaving a sinking ship. That's a significant indication that's different from these other things that you're talking about. Why can't the reasonable jury come to that conclusion? Your Honor, here the district judge looked at the record evidence, and as I said, under a generous legal standard, and looked at it through their eyes, their arguments. And he found, comparing the Flynn report to the other information, the way I suggest that this Court could do, that there was nothing new and fraud-revealing in the Flynn report. No, I understand that that's what he did. But we don't owe any deference whatsoever to the district judge on this issue, right? That's right, Your Honor. We reviewed the noble. Right. So the fact that he saw it that way doesn't help you at all unless you can persuade me to see it that way. Me and at least one of my colleagues. That's right, Your Honor. That's right, Your Honor. So on the off chance that persuading me will make a difference to your case, why don't you tell me why I should view it the same way as the district judge did? Let me try it this way, Your Honor, if I may. I pointed from the reply brief to this Court. Say, I'm quoting from page 14. The new fraud-disclosing information revealed by the Flynn report was that Apollo had materially changed its competition plan because of the undisclosed DOE report giving rise to enhanced material business risks. Because of the education report. And, Your Honor, when you look at the Flynn report, which they cite right there, 502 in the excerpts of record, she doesn't say they changed it because of. It's not in there. When you look at 502, it's less than half a page of bullet points. The program review report is mentioned once. It's not even in the same paragraph with the point about enrollment counselor turnover. So even, Your Honor, if you disagree with me that it's not new, and if you disagree with me that even if you strike Ms. Thomson's testimony, they still have an absence of proof on a key point, it remains the case that there's nothing fraud-revealing. Take their terms. Look at the Flynn report. There's nothing fraud-revealing. Here's my problem with this. You had the DOE report, which was not public, which Apollo went to great lengths to keep not public, which was spun in a sense. I mean, they had this spin campaign going on to put the best light on it. And this went on for a long period of time until Ms. Flynn actually gets the report, delves into it, and says this is big problems for Apollo. And she says it not just for the turnover, which I think alone would allow a jury to reach the conclusion that it did. And don't forget, on a 50-beat standard, he has to find that no reasonable jury could reach that conclusion. And there at least was competing evidence on this. She also found that there were regulatory problems facing Apollo as opposed to the sector that she predicted would happen, that congressional scrutiny might be one product of this. And that's why she downgraded the stock. So she just didn't downgrade the stock, and that alone caused the decline in the stock. She had good reasons for it that I don't think were ever articulated before. And you could say, well, that's connecting the dots. But the dots were based on facts that were articulated for the first time in this report. And even though a judge maybe sitting on a bench trial might have reached a different result, the jury heard all of this and came to a different conclusion. And I don't see how a judge has the ability or authority to overturn a jury under those circumstances. Even though you have very good arguments, you articulate them very well about why your side should have won the case, they didn't. And I don't see why a judge would be so eager to turn over, or even eager, but at least willing to turn over a jury's verdict based on that type of record. Your Honor, a few points, if I may. For starters, the allegations that she's disclosing for the first time that there's an Apollo-specific risk or that Congress might get involved, I suggest, Your Honor, if you actually look at the newspaper articles from the prior week, that they talk about those things specifically, both Apollo-specific and congressional interest. It's also the case, Your Honor, that, as I said, everybody agrees that this stock is heavily followed and that there are a lot of people writing about it and talking about it. And so a lot of the analysis is already coming out in lots of different ways. The fact that, in this case, she has this very short set of bullet points, when you read them, Your Honor, they are not like a connect-the-dots analysis. It is not even like the type of connect-the-dots analysis that's been rejected in other cases. You know, in the Merck case, for example, the Third Circuit, in that case, you actually had a Wall Street Journal reporter coming in and doing new analysis. And what the court said was, you know, look, the facts were disclosed, and it's simply too much for us to say that every analyst following Merck was in the dark. The market's not that stupid. Your Honor, let me also just suggest, in the Metzler case, in this circuit... Yes, Your Honor, there is a... The day afterwards... Yes, Your Honor, there is a drop... If I were a jury, I would find that of some significance. Your Honor, as I said earlier, it is true, as I said, that there is new information in the Flynn report. The chief thing that's new is her downgrade. Before the market opens on the 20th, there's a wire report that gives that as the headline. UBS downgrades Apollo. That's the headline. That's new, but it's not fraud-revealing. And a corrective disclosure under the unchallenged instruction here has to be revealing fraud to the market. Now, you keep sliding from whether it's corrective to whether it's fraud-revealing. I'm not sure that I quite understand why I should agree with you about fraud-revealing. We had a lot of statements by Apollo early on that are pretty directly in conflict with what Flynn is coming out with. Your Honor, as I said, the unchallenged jury instruction here defines a corrective disclosure as a disclosure that reveals the fraud to the market. Right, but it seems to me quite obvious that the things that are in the Flynn report seriously contradict numerous statements by Apollo and that the jury could readily conclude that they are fraud-revealing. The question for me is whether or not they are sufficiently new or important to cause the drop in price. Fraud-revealing seems to me patent. Well, Your Honor, on that point, I disagree, and I submit that if fraud-revealing were patent here, we wouldn't be having this debate, and the plaintiff would not be struggling in the reply brief to claim that there are things in the Flynn report that just aren't there. And that this Court in Meltzer, it's a pleading case, so if anything, the standard is a little bit more generous, was prepared to look at what the plaintiff in that case said was the corrective disclosure and said, look, when we look at these things, they just cannot be reasonably read to be a corrective disclosure. So this Court in that case did just what the district judge did here. Okay. Thank you. Thank you, Your Honor. Mr. Simon? Briefly, Your Honors, rather than wading back into the points that I think you've elaborated on, let me tell you the reasons why the Flynn report is new in addition to the ones you've been discussing, although I think the ones you've been discussing are plenty for a reversal. But there are things we haven't talked about, the intensity and the credibility of the report. UBS is an investment bank. It's not the Arizona Republic. The Wall Street Journal report is not really an analysis. It's kind of a newspaper article after one day. We have Hannon v. Data Products and we have Basic talking about the fraud doesn't get undone until the information hits the market with an intensity and credibility sufficient to do it. This was credible from an education specialist at an investment bank, and it was intense. It's a downgrade. They have a sell sign on 7% of the stocks they follow. That's a big change in what they did. It's a downgrade, and there are lots of things that are different in her report. She does say this is Apollo-specific risk. You can go read the other articles. All the articles make it sound like an industry-wide problem. Well, I'm not sure that's quite true of the Wall Street Journal article. The Wall Street Journal article, Judge Fletcher, I think, does quote – well, I'm sorry. I was moving to my next point. I wasn't thinking about what you said. They do point out Apollo risks, but they point out industry risks as well, I believe. But there's a second point, which is that Gilead and Lormond from the Fifth Circuit both say you can't have a full disclosure if the company is still denying they did anything wrong. And in all of the newspaper articles, Apollo is given a podium to say this is all wrong. DOE is wrong. We never did any of those things. It's a chief settlement. We'll fight to the death. That's why the message in the early reports, including the first UBS report, compare Flynn 1 to Flynn 2, Charette's report on September 8th, ER 624. It doesn't sound anything like this. Now, the other point I would make is one, I guess, I think, that's said best by Judge Easterbrook from Chicago, which is in the Asher case, cited in a reply brief. But the Fifth Circuit also says it in FLOSERV, in a per curiam opinion, in which Justice O'Connor sits on the panel. They say, if nothing happened, why did the stock go down? The stock went down two days in a row, substantially. The volume is also very high. We didn't give you the volume figures in the briefs, and I apologize for that, but they are on the record. The volume goes from 2 million to 4 million to 6 million shares. So the position that Dr. Lean asked the jury to take, which the jury rejected, was that nothing was happening. He pointed to no alternative explanation. That was the holding of Metzler. There were other reasons why the stock went down. So the two positions presented to the jury were as follows. Position number one from the plaintiffs was the UBS report came out. It had four or five or six different things that were new. Not three. Three is a joke. It's from quoting trial counsel's argument to the jury on rebuttal and quoting it out of context. But we've given you in the brief four or five or six things that are different. But Feinstein, the plaintiff's expert, said the stock went down because of the UBS report. It went down over a period of two days. If you want to look at it more broadly, it went down for six days. If you want to call the Arizona Republic a small partial disclosure, either one is statistically significant, and that is the cause. And he said he looked at the other things that were new in the market and other things that were allegedly new in the market and they weren't new. Dr. Lean for the defense said the stock went down in a statistically significant way on September 21st. I've looked at the other alternative causes. I can't find any that explain this. So I would have to say it is random. He had previously testified, of course, that statistical significance suggests to a 95% or higher likelihood that something is not random. The jury chose between the two inferences being offered to them. Now, there's a quote that this court has twice made in the last six or seven years, and I'd just like to give it to you unless the court has any questions. I think I've completed my rebuttal. Twice the court has said that unless reasonable inferences from circumstances suffice to get a case to a jury, the welfare of victimized investors and the integrity of the stock market may be insufficiently protected from deceptive manipulatives. That's Ronconi v. Larkin, Judge Kleinfeld writing the opinion. It's quoted in America West. This is a case where, of course, we got to the jury, but it didn't do us very much good. I think the jury verdict is entitled to deference, and I think on the Rule 50d motion, the trial judge, with due respect, was looking at a narrower range of things that were new in the report than actually were in the record. Thank you very much. Thank you. HSIU was submitted. Thank you, counsel, for a very good argument on both sides. Thank you very much. Very illuminating.
judges: Gettleman, Kozinski, Fletcher W.